fund producing such income—i. e., one-third or one-sixth of the estate, as the case might be—to be freed from the trust upon her death, the grandson's share of income to be paid him until he attains the age of 26 years, and the fund producing said income to be freed from the trust upon his attaining that age, with remainders over to the testator's next of kin; (b) a trust in another third of the estate to pay the income to the daughter for life, and upon her death to the grandson until he attains the age of 26 years or sooner dies, with remainder over to the testator's next of kin; (c) a trust in another third of the estate to pay the income to the grandson until he attains the age of 26 years, with remainder over to the grandson in case he attains that age, and with successive substituted remainders—first to the lawful issue of the grandson, second to the widow and daughter of the testator or the survivor of them, and third to the testator's next of kin. We may be certain that the foregoing construction effectuates the testator's intention in so far as it is possible to ascertain it and give it effect. In so far as it may fail to carry out what the testator really intended, the fault is either his or that of the draftsman of the will.

The judgment appealed from dismissed the complaint upon the merits, although the learned trial justice made findings of fact and conclusions of law substantially construing the will in accordance with the views herein expressed. The guardian ad litem properly asks that the judgment contain an adjudication construing the will. The parties are all before the court, and we can see no obstacle in the way of making an adjudication now which will save unnecessary litigation in the future.

The judgment may be modified accordingly, and, as modified, affirmed, with costs to all parties payable out of the estate. All concur.

---

NEWMARK v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Second Department. June 12, 1908.)

1. CARRIERS—TRANSPORTATION—TRAINS.

A passenger, having paid his fare, is not entitled to board a train not scheduled to stop at the station from which he is to embark.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, §§ 1040–1042.]

2. SAME—OPERATION OF TRAINS—CARE REQUIRED.

If an engineer in charge of a passenger train knows that a passenger is in a dangerous position, and is actually trying to board a train while in motion, the engineer would be bound to use care incident to such special knowledge; but, in the absence thereof, it is his duty to operate the train in a manner consistent with the safety with those already on board.

3. SAME—BOARDING TRAIN IN MOTION—CONTRIBUTORY NEGLIGENCE.

Plaintiff went to defendant's passenger station to take one of defendant's local trains. The first train passed the station loaded, without stopping. Shortly after a second train approached at reduced speed, and as it did so the crowd rushed forward to get aboard. The train did not stop, though the speed was reduced to from two to four miles an hour. Plaintiff, who was at the far end of the platform, waited until the last car approached, when he stepped on the lower step of the platform, with both hands holding the guard rails, and while in this position the

train gave a sudden jerk, and he fell therefrom and was injured. The train was not scheduled to stop at that station, and was not intending to stop there, but reduced speed in response to a block signal prior to being transferred to another track. *Held*, that plaintiff was negligent as a matter of law, contributing to the accident, and could not recover.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 1369.]

Appeal from Trial Term, Kings County.

Action by Julius Newmark against the New York Central & Hudson River Railroad Company. From a judgment for plaintiff, and from an order denying defendant's motion for a new trial on the minutes, it appeals. Reversed, and new trial granted.

Argued before WOODWARD, HOOKER, GAYNOR, RICH, and MILLER, JJ.

Robert A. Kutschbock, for appellant.

Frederick Wiener, for respondent.

WOODWARD, J. The plaintiff has recovered a judgment of $5,-646.20 against the defendant in an action for damages for personal injuries alleged to have been sustained through the negligence of the defendant, without fault on the part of the plaintiff; the defendant appealing from the judgment and order denying a motion for a new trial.

On the 10th day of March, 1905, at about 20 minutes past 7 o'clock in the morning, the plaintiff entered upon the platform of the defendant's station at 110th street, intending to take a train for the Grand Central Station. The plaintiff had been in the habit of using the subway in going to his work downtown, but owing to a strike among the employés of that line he made use of the defendant's lines; the first occasion being the morning prior to the accident complained of in this action. The station platform at 110th street is 262 feet long and something over 9 feet wide; the four tracks of the defendant being upon a viaduct at this point. The outside tracks are used for local traffic, and the two inside tracks for through trains. Track No. 1, which passes immediately alongside of the platform, is used for the south-bound local traffic, and on the morning of the accident there were from 150 to 200 people upon this platform waiting for transportation. One train came along and passed over this south-bound local track without stopping, so it must have been apparent that all trains using this local track did not stop for passengers. Shortly afterward a second train came along, reducing its speed as it approached the station, and the crowd pushed forward to get aboard. This train did not stop, though it appears from the evidence that it was reduced in speed until it was going only from two to four miles an hour. The cars were all full, and the platforms of the eight cars comprising the train were all more or less filled with passengers, and it appears that several men and women took advantage of the slow movements of the train to get on board. The plaintiff at this time was at or near the southern end of the platform. He had seen one train go by, and he stood there at the southern end of the platform until an engine, tender, and seven cars had passed the point where he was standing, and then, fearing that he would have no other chance to get

on board, he stepped upon the lower step of the platform of the last car, with both hands holding to the guard rails of the car, and while in this position his witnesses testify that the train gave a sudden jerk, and he felt his hold give way, and the next he knew he was falling into darkness. He was so seriously injured that both legs had to be amputated—one at the thigh, the other just below the knee. This train came down the Harlem Branch from Brewster. Owing to the strike, the defendant had ordered four extra cars to be attached to the train at Mt. Kisco, so that the train consisted of eight cars. This train did not ordinarily stop at 110th street. It was not scheduled to stop there, nor, indeed, at many of the local stations. On this morning, however, the defendant, to assist in taking care of the heavy traffic, had given orders that the train should pick up passengers until it was full, and should then proceed, making only its regular stops. The road is operated by the block system; the block covering the point of the accident extending from 114th street to 108th street. The engineer of the train had orders not to stop at 110th street; but the towerman, having charge of the block, had received orders to transfer this train from track No. 1 to track No. 2, it being feared that with the heavily loaded train it would not be safe to operate through the narrow tunnel of track No. 1. It appeared, however, that there was a through train within this block at the particular time that the accident train approached, and so the signal was displayed, calling upon the engineer to slow down until the way was clear, and it was in response to this signal that the train was decreased in speed as it approached the 110th street station. The train, if the way was not cleared, would have to come to a stop at 108th street; but it appears from the evidence that just as the plaintiff stepped upon the platform of the last car the signal which barred the way was changed, the tracks were open, and the engineer released the air brakes and proceeded on his way, only to be stopped immediately afterward by the whistle which was sounded by one of the trainmen who witnessed the accident. This is the explanation given of the sudden jerk or jolt, as it is termed by the plaintiff's witnesses, by the defendant, and it is not disputed, and the evidence does not disclose that it was such a jolt as to occasion any serious disturbance to any one who was already upon the train in a safe position.

The question presented upon this appeal is whether the defendant was guilty of negligence under the circumstances, whether it failed in the discharge of any duty which it owed to this plaintiff, and whether the plaintiff was himself free from negligence contributing to the accident; and these two questions are very closely related here, for the degree of care on the part of the defendant, as it related to this plaintiff, must be determined by what it had a right to anticipate the plaintiff would do. There is no question, under the evidence, that if the track which it became necessary to use for the safety of the defendant's passengers had been free the train would not have slackened its speed at this point, and the plaintiff would not have been injured, for it would have been obvious that the train was not to stop. But railroads have to be practically operated. They are charged with a

high degree of care to transport passengers safely, and they must slacken the speed or stop altogether when necessary to preserve the lives and limbs of passengers, and they must do this whether they are near a passenger station or not. They must, likewise, in handling the traffic of a great city, operate with due regard to the convenience of the public, and in the practical running of trains it is neither economical nor expedient to make stops unless absolutely necessary. Great loss of energy results from the mere loss of momentum, so that it is customary to keep trains in motion through delays so far as possible, even though the rate of progress is very slow. The engineer on this particular train had his orders not to make any further stops, and he was only slacking his speed in obedience to the danger signals, and he had no reason to anticipate that with his train moving at the rate of two to four miles an hour passengers, without invitation, would clamber aboard, and when he received the signal that the track was clear it does not appear that he did anything except to release the air brakes, thus letting the train proceed at the speed which would have been maintained, except for the application of the brakes. If this had resulted in injuring some passenger already upon the train, in a safe position except for the act of the engineer, there would be a question for the jury; but is this true where the injury results to one who has clambered on while the train was still in motion, and where there was no invitation on the part of any one for the passenger to get on board? Was the engineer, performing the service of the defendant, bound to assume that people would attempt to board the train, simply because it had become necessary for him to reduce the speed in answer to a danger signal? Was he bound to operate the train in such a careful manner that a passenger in the act of climbing aboard should not be injured, when he did not know that there was such a passenger?

The evidence of the witnesses on the train is to the effect that the so-called sudden jerk was merely such a jolting of the cars as is usual in changing the rate of speed or in releasing the air brakes, and negligence has scarcely reached the degree of refinement where a defendant is bound to operate its trains in such a manner that no one shall be swayed or jostled in crowded cars, where there is no injury to those who are properly in their places. The plaintiff, while he had paid his fare and was entitled to a ride, was not entitled to a ride upon this particular train, for it was not scheduled to stop at this station, and the defendant cannot be held to any higher duty toward him than to operate its train in a manner consistent with its obligation to him in his known situation. If the defendant, through its engineer, who had charge of the physical operation, knew that the plaintiff was in a dangerous position, or if it knew that he was actually trying to get on board, it would owe the duty of using the care incident to such special knowledge; but in the absence of such special knowledge it was discharging its duty in operating its train in a manner consistent with the safety of those who were already on board, and none of these are here complaining. This is, perhaps, but another way of saying that the plaintiff was, as matter of law, guilty of negligence contributing to the accident. He voluntarily placed himself in a situation where

the ordinary and incidental acts of the engineer in operating the train produced the injury, and he is hardly in a position to complain of the result.

While there was for a time an apparent conflict of authority in the Court of Appeals as to the status of one who got on or off of a moving train, the law appears to have been brought back to a harmonious foundation in the recent case of Mearns v. Central R. R. Co. of N. J., 163 N. Y. 108, 111, 57 N. E. 292, where the case of Solomon v. Manhattan R. Co., 103 N. Y. 437, 9 N. E. 430, 57 Am. Rep. 760, is recognized as laying down the correct rule. In that case it was said that it is "the general rule of law, established by the decisions in this and other states, * * * that the boarding or alighting from a moving train is presumably and generally a negligent act per se, and that in order to rebut this presumption, and justify a recovery for an injury sustained in getting on or off a moving train, it must appear that the passenger was, by the act of the defendant, put to an election between alternative dangers, or that something was done or said, or that some direction was given to the passenger by those in charge of the train, or some situation created, which interfered to some extent with his free agency, and was calculated to divert his attention from the danger, and create a confidence that the attempt could be made in safety"; and the court in the same case say:

"In boarding a moving train there is generally less excuse than in alighting from one. The party attempting it is not often under the same stress of circumstances as frequently happens in the former case. He may be compelled to wait for another train; but this is an inconvenience merely, which does not justify exposing himself to hazard."

This was exactly the situation in the case at bar. It is true that plaintiff's witness and special friend testified that when the train came up to the station the conductor was on the front platform of the first car and that he waved his hand and cried "All aboard!" But the plaintiff distinctly testified that he did not hear anything of the kind, so that no special invitation reached him, and there was absolutely nothing in the circumstances which can be fairly construed as holding out an invitation for the plaintiff to climb on board this train while in motion. The statement that he thought it was going to come to a full stop is hardly consistent with the fact that the last car was passing the southern end of the platform when he made his effort to get on board, and under the authorities we are clearly of the opinion that the plaintiff is not entitled to recover in this action.

The suggestion that he had already reached a place of safety, and was entitled to the degree of care of other passengers, is hardly supported by the evidence. The most that can be spelled out of the evidence is that the act of the plaintiff in stepping upon the lower step of the car, with both hands holding upon the railings, occurred simultaneously with the jerking of the car. He had not reached a place of safety. He was merely in the act, and before he had reached a place of safety, or had placed himself where the defendant owed him any special duty, he was forced to loosen his hold by the jerking of the cars, and the result followed. It is unfortunate for the plaintiff; but the

law is clear upon this subject, and the judgment and order appealed from must be reversed.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event. All concur.